# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 28, 2007          Decided July 17, 2007

No. 06-1091

AERONAUTICAL REPAIR STATION ASSOCIATION, INC. *ET AL.*,
PETITIONERS

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

AIRCRAFT MECHANICS FRATERNAL ASSOCIATION,
INTERVENORS

Consolidated with
06-1092

On Petitions for Review of a Final Rule of the
Federal Aviation Administration

*Albert J. Givray* and *Andrew D. Herman* argued the cause for the petitioners. *Jere W. Glover* and *Marshall S. Filler* were on brief.

*Edward Himmelfarb*, Attorney, United States Department of Justice, argued the cause for the respondent. *Peter D. Keisler*, Assistant Attorney General, *Leonard Schaitman*, Attorney, United States Department of Justice, and *Paul M. Geier*,

Assistant General Counsel for Litigation, United States Department of Transportation, were on brief. *Mark W. Pennak*, Attorney, United States. Department of Justice, entered an appearance.

*Lee Seham* and *James R. Klimaski* were on brief for *amicus curiae* Aircraft Mechanics Fraternal Association in support of the respondent.

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Circuit Judge* SENTELLE.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The petitioners[1] challenge a final rule (2006 Final Rule or Rule) of the Federal Aviation Administration (FAA) which amends its drug and alcohol testing regulations, promulgated pursuant to 49 U.S.C. § 45102(a)(1), to expressly mandate that air carriers require drug and alcohol tests of all employees of its contractors—including employees of subcontractors at any tier—who perform safety-related functions such as aircraft maintenance. Antidrug and Alcohol Misuse Prevention Programs for Personnel Engaged in Specified Aviation Activities, 71 Fed. Reg. 1666 (Jan. 10, 2006). The petitioners challenge the Rule on the grounds that it impermissibly expands the scope of employees tested in violation of the unambiguous statutory language of section 45102(a)(1), the Administrative Procedure Act, 5 U.S.C. §§ 701-06, and the Fourth and Fifth Amendments to the United States Constitution. In addition, they challenge the FAA's conclusion that it was not required to

---

[1]The petitioners are: Aeronautical Repair Station Association, Inc., Premier Metal Finishing, Inc., Pacific Propeller International LLC, Texas Pneumatics Sys., Inc., Solutions Mfg., Inc. and Randall C. Highsmith. Fortner Eng'g & Mfg., Inc. and Minas Serop Jilizian intervened as petitioners.

conduct a regulatory flexibility analysis under the Regulatory Flexibility Act (RFA) because the Rule does not have a significant adverse effect on small entities.  For the reasons set forth below, we uphold the substance of the Rule but reject the FAA's RFA determination.

## I.

The FAA first promulgated drug testing regulations in 1988 pursuant to the Congress's general directive in 49 U.S.C. app. § 1421(a)(6) (1988) that the Secretary of Transportation "promote safety of flight of civil aircraft in air commerce" by prescribing "reasonable rules and regulations, or minimum standards." *See* Anti-Drug Program for Personnel Engaged in Specified Aviation Activities, 53 Fed. Reg. 47,024 (Nov. 21, 1988) (1988 Rule).[2]  The 1988 Rule required that each employer test "each of its employees who performs" one of eight enumerated "sensitive safety- or security-related" functions, 14 C.F.R. § 21.457 (1992),[3]  and defined "employee" as "a person

---

[2]In its advance notice of proposed rulemaking, the FAA had invited comments on both drug and alcohol abuse and regulation, *see* 1988 Rule, 53 Fed. Reg. at 47,024, but ultimately "excluded the issue of alcohol testing from th[e] rulemaking for a variety of reasons." 1988 Rule, 53 Fed. Reg. at 47,048.

[3] The eight functions listed were:

　　a. Flight crewmember duties.
　　b. Flight attendant duties.
　　c. Flight instruction or ground instruction duties.
　　d. Flight testing duties.
　　e. Aircraft dispatcher or ground dispatcher duties.
　　f. Aircraft maintenance or preventive maintenance duties.
　　g. Aviation security or screening duties.
　　h. Air traffic control duties.

53 Fed. Reg. at 47,058 (codified at 14 C.F.R. pt. 121, app. I § II).

who performs, either directly or by contract" any of the enumerated functions, 14 C.F.R. pt. 121, app. I § II (1992).

In 1991 the Congress enacted the Omnibus Transportation Employee Testing Act (Omnibus Act), which for the first time expressly directed the FAA to promulgate alcohol and drug testing regulations:

> The Administrator shall, in the interest of aviation safety, prescribe regulations within 12 months after [October 28, 1991]. Such regulations shall establish a program which requires air carriers and foreign air carriers to conduct preemployment, reasonable suspicion, random, and post-accident testing of airmen, crewmembers, airport security screening contract personnel, and other air carrier employees responsible for safety-sensitive functions (as determined by the Administrator) for use, in violation of law or Federal regulation, of alcohol or a controlled substance. The Administrator may also prescribe regulations, as the Administrator considers appropriate in the interest of safety, for the conduct of periodic recurring testing of such employees for such use in violation of law or Federal regulation.

Pub. L. No. 102-143, tit. v, § 3, 105 Stat. 917, 953 (Oct. 28, 1991) (codified at 49 U.S.C. app. § 1434; recodified, as amended, at 49 U.S.C. § 45102(a)(1)).

Pursuant to the Omnibus Act, in 1994 the FAA revised its drug testing regulations, Antidrug Program for Personnel Engaged in Specified Aviation Activities, 59 Fed. Reg. 42,922 (Aug. 19, 1994) (1994 Drug Rule), and promulgated regulations for the first time for alcohol testing, Alcohol Misuse Prevention Program for Personnel Engaged in Specified Aviation, 59 Fed. Reg. 7380 (Feb. 15, 1994) (1994 Alcohol Rule). Both the 1994 Drug Rule and the 1994 Alcohol Rule required that an

"employer" test each covered "employee," again defined as "a person who performs, either directly or by contract" any of eight listed "safety-sensitive" functions, 59 Fed. Reg. at 7390 (alcohol), at 42,928 (drugs). Both rules also listed the same eight functions, which were substantially the same as those in the 1988 Rule, *see supra* note 3:

1.  Flight crewmember duties.

2.  Flight attendant duties.

3.  Flight instruction duties.

4.  Aircraft dispatcher duties.

5.  Aircraft maintenance or preventive maintenance duties.

6.  Ground security coordinator duties.

7.  Aviation screening duties.

8.  Air traffic control duties.

59 Fed. Reg. at 7391, 42,928.

On February 28, 2002, the FAA issued a notice of proposed rulemaking seeking to revise its drug and its alcohol testing regulations. Antidrug and Alcohol Misuse Prevention Programs for Personnel Engaged in Specified Aviation Activities, 67 Fed. Reg. 9366 (Feb. 28, 2002) (NPRM). Significantly, the NPRM proposed to amend the definition of a covered "employee" subject to testing as "[e]ach employee who performs a function listed in this section directly or by contract (*including by subcontract at any tier*) for an employer." 67 Fed. Reg. at 9377 (drugs) (proposed to be codified at 14 C.F.R. pt. 121, app. I § III), 9380 (alcohol) (proposed to be codified at 14 C.F.R. pt. 121, app. J § II) (emphasis added). The FAA explained that it proposed including the italicized language "to clarify that each person who performs a safety-sensitive function directly or by

*any tier of* a contract for an employer is subject to testing." 67 Fed. Reg. at 9368 (emphasis added). The FAA maintained that the added language did not work "a substantive change because the current rule language states that anyone who performs a safety-sensitive function 'directly or by contract' must be tested" and "[t]he regulations have always required that any person actually performing a safety-sensitive function be tested, and we are proposing to clarify that performance 'by contract' means performance under any tier of a contract." *Id*. at 9369. The FAA further explained that it believed the clarification necessary because of "conflicting guidance provided by the FAA." *Id*.[4] The NPRM requested "comment on [its] proposal to clarify this subject." *Id*. at 9370.

In early 2004, after receiving a substantial number of critical comments, the FAA issued a final rule in which it announced that, "[i]n order to gather more information on the concerns expressed by the commenters," it was "not adopting the proposed revision in th[e] final rule" but would be "publishing a Supplemental Notice of Proposed Rulemaking (SNPRM) in the near future." Antidrug and Alcohol Misuse Prevention Programs for Personnel Engaged in Specified Aviation Activities, 69 Fed. Reg. 1840, 1841 (Jan. 12, 2004).

On May 17, 2004, the FAA published the SNPRM, addressing the subcontractor issue at length and responding to comments it had received. Antidrug and Alcohol Misuse Prevention Programs for Personnel Engaged in Specified Aviation Activities, 69 Fed. Reg. 27,980 (May 17, 2004). The SNPRM again proposed adding the "subcontract at any tier" language and reopened the subject for public comment.

The 2006 Final Rule, issued January 10, 2006, amended the testing regulations, as proposed in the NPRM and the SNPRM,

---

[4]On the "conflicting guidance," *see infra* Part IV.B.1.

to require testing employees who perform the listed functions "directly or by contract (including by subcontract at any tier)." Antidrug and Alcohol Misuse Prevention Programs for Personnel Engaged in Specified Aviation Activities, 71 Fed. Reg. 1666, 1676, 1677 (Jan. 10, 2006). In addition, the FAA certified that the 2006 Final Rule "will not have a significant economic impact on a substantial number of small entities" and that it was therefore "not required to conduct an RFA analysis." 71 Fed. Reg. at 1674.

The petitioners filed petitions for review on March 10 and March 13, 2006.

## II.

The petitioners challenge the 2006 Final Rule on four grounds. We address each ground separately.

### A. Statutory Authority

First, the petitioners assert that the scope of employee testing expressly required under the 2006 Final Rule—including employees of subcontractors "at any tier"—exceeds the FAA's statutory authority under the Omnibus Act. We review the FAA's interpretation of the statutory language under the familiar two-step framework of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, we ask first "whether Congress has directly spoken to the precise question at issue"; if it has, "that is the end of the matter" and "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. The Omnibus Act directed the FAA to establish regulations requiring testing of "airmen, crewmembers, airport security screening contract personnel, and other air carrier employees responsible for

safety-sensitive functions (as determined by the Administrator)." 105 Stat. at 953. We conclude that the statutory language is ambiguous as to whether the testing requirement applies to employees of all subcontractors, at whatever tier, and that the FAA reasonably construed the statute under the second step of *Chevron* to determine that it does.

### 1. "Other air carrier employees"

First, the FAA reasonably concluded that the phrase "other air carrier employees" can include employees of an air carrier's contractors as well as its direct employees. Although not perhaps its most common meaning, "employee" can be used to refer to an employee of a contractor as well as to an employer's direct employee. *See Wash. Metro. Area Transit Auth. v. Johnson*, 467 U.S. 925, 933 (1984) (while "word 'employee' denotes a contractual relationship and a contractor never is contractually bound to the employees of a subcontractor," general contractor and its subcontractor's employees were held to be "employer" and "employees" under section 5(a) of Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(a), based on statute's language and history (internal quotation omitted)). Indeed, the language of the Omnibus Act indicates the Congress may have intended that "employee" have just such an expansive meaning. On its face, the Omnibus Act as initially enacted expressly required testing employees of certain contractors (in addition to direct employees), namely, "airport security screening *contract* personnel." 105 Stat. at 953 (emphasis added). Further, the phrase "and *other* air carrier employees," immediately following the list of the three specifically enumerated testing categories, suggests that the Congress considered "airport security screening contract personnel" to be employees just as it did the other two listed classes ("airmen" and "crewmembers").[5] *Id*.

_____

[5]In 2001, the Congress enacted the Aviation and Transportation

(emphasis added). Else the word "other," used in the sense of "more" or "additional," *see* Webster's Third New Int'l Dictionary 1598 (1993), would have been entirely inappropriate. *See also* S. Rep. No. 102-54, at 18 (May 2, 1991) ("*groups of employees* required to be covered by the new testing programs *include* airmen, crew members, and *airport security screening contract personnel*") (emphases added). The juxtaposition of the statutory terms likewise suggests that the class of "other air carrier employees" subject to testing can be read to include other contractors' employees—a point the petitioners do not dispute. *See* Pet'rs Br. at 9 ("A person need not be on an air carrier's payroll to qualify as an 'air carrier employee.' The industry, for example, has long accepted that employees of certificated repair stations may meet this description . . . . "). They do, however, vigorously contest that the phrase includes employees of *all* subcontractors (at whatever tier, whether or not "certificated"), contending instead that the phrase cannot reasonably embrace employees of "noncertificated" subcontractors. Before addressing their argument, we provide some background on the FAA's certificated maintenance program.

---

Security Act (ATSA), Pub. L. No. 107-71, 115 Stat. 597 (2001), which "creat[ed] a federal workforce to screen passengers and cargo at commercial airports," *Am. Fed'n of Gov't Employees v. Loy* 367 F.3d 932, 934 (D.C. Cir. 2004). Accordingly, it amended the alcohol and drug testing statutes by striking "contract personnel," "contract employee" and "contract employees" throughout Chapter 451 of title 49 of the U.S. Code (including section 45102(a)(1)'s reference to "airport security screening contract personnel") and replacing the terms, respectively, with "personnel," "employee" and "employees." ATSA § 139, 115 Stat. at 640. There is no indication the Congress intended the amendments to preclude continued treatment of contractors' employees as air carriers' employees subject to testing, as they were treated under the 1988 Rule and the 1994 Rule, both of which defined a covered "employee" as "a person who performs, either directly or by contract," one of the eight listed functions.

As the petitioners explain, air carriers "routinely" contract with repair stations that are "certificated" under 14 C.F.R. ch. I, subch. H, pt. 145. Pet'rs Br. at 7. A Part 145 repair station is authorized to "[p]erform maintenance, preventive maintenance, or alterations" on aviation components or to "[a]rrange for another person," that is, a subcontractor, whether certificated or not, "to perform the maintenance." 14 C.F.R. § 145.201(a)(1)-(2).[6] If the subcontractor is not certificated, the certificated repair station "must ensure that the noncertificated person follows a quality control system equivalent to the system followed by the certificated repair station," *id*. § 145.202(a)(2), and must approve the aviation component for return to service, *see id*. §§ 43.7, 145.217(b) ("A certificated repair station may contract a maintenance function pertaining to an article to a

---

[6]Section 145.201(a) provides:

(a) A certificated repair station may—

(1) Perform maintenance, preventive maintenance, or alterations in accordance with part 43 on any article for which it is rated and within the limitations in its operations specifications.

(2) Arrange for another person to perform the maintenance, preventive maintenance, or alterations of any article for which the certificated repair station is rated. If that person is not certificated under part 145, the certificated repair station must ensure that the noncertificated person follows a quality control system equivalent to the system followed by the certificated repair station.

(3) Approve for return to service any article for which it is rated after it has performed maintenance, preventive maintenance, or an alteration in accordance with part 43.

45 C.F.R. § 145.201(a)(1-3).

noncertificated person provided—(1) The noncertificated person follows a quality control system equivalent to the system followed by the certificated repair station; (2) The certificated repair station remains directly in charge of the work performed by the noncertificated person; and (3) The certificated repair station verifies, by test and/or inspection, that the work has been performed satisfactorily by the noncertificated person and that the article is airworthy before approving it for return to service."). With this background, we first address the FAA's interpretation of the statutory language as extending to employees of subcontractors generally, then consider the petitioners' objection to employees of noncertificated subcontractors in particular.

First, as to employees of subcontractors generally, having concluded that the statute itself expressly contemplates testing certain contractors' employees ("airport security screening contract personnel") and that the statutory phrase "other air carrier employees" may include contractors' employees, we see nothing in the statutory language that prevents the FAA from also treating a *sub*contractor's employees as statutory "employees" of air carriers. The Omnibus Act itself does not mention subcontractors and we believe the FAA, under *Chevron* step 2, reasonably included subcontractors among the contractors whose employees are "other air carrier employees" subject to testing. The FAA soundly reasoned that "it is important that individuals who perform any safety-sensitive function be subject to drug and alcohol testing under the FAA regulations" and that to conclude otherwise "would be inconsistent with aviation safety." 2006 Final Rule, 71 Fed. Reg. at 1667.

As for employees of "noncertificated" subcontractors in particular, we believe that they too may be reasonably treated as "other air carrier employees" and thus subject to mandatory testing under the Omnibus Act. The petitioners do not object to

the FAA's requiring drug and alcohol testing of certificated subcontractors' employees, noting that the aviation industry "has long accepted that employees of certificated repair stations may meet this description because they work in the aviation industry, deal directly and routinely with air carriers, are heavily regulated by the FAA, and (like an air carrier's own specially licensed employees) are involved in the critical function of making airworthiness determinations," Pet'rs Br. at 9. They insist, however, that employees of "noncertificated" subcontractors may not be considered air carrier "employees" subject to mandatory testing and they offer what may well be a valid ground for treating certificated and non-certificated subcontractors differently, namely, that "[f]or certificated entities, . . . drug and alcohol testing logically operates as part and parcel of an already-comprehensive program of government supervision" so that "the certificated firm—precisely because it chooses to be certificated—can be seen as acting as an alter ego of the air carrier, so that its workers can be fairly characterized as 'air carrier employees.' " *Id*. at 15. This distinction, however, is not mandated by the language of section 45102(a)(1) which says nothing about certification *vel non*. What section 45102(a)(1) does require is that the FAA Administrator determine those "safety-sensitive functions"—performed by other than "airmen, crewmembers, [and] airport security screening contract personnel"—subject to drug and alcohol testing and the FAA has consistently and reasonably included aircraft maintenance work among such functions. *See* 1994 Alcohol Rule, 59 Fed. Reg. at 7391 (including aircraft maintenance or preventive maintenance duties among "safety-sensitive" duties); 1994 Drug Rule, 59 Fed. Reg. at 42,928 (same); *cf*. 1998 Rule, 53 Fed. Reg. at 47,058 (including "maintenance or preventive maintenance" among "sensitive safety- or security-related" duties subject to drug testing). It is not unreasonable, then, to construe the statute, as the FAA does, to require testing of maintenance

employees, certificated or not, in order to ensure that all maintenance work, by whomever performed, is done properly and that each aviation component is safe for aviation use. In the FAA's view, it "would be inconsistent with aviation safety for individuals performing maintenance work within the certificated repair station to be subject to drug and alcohol testing, while individuals performing the same maintenance work under a subcontract would not be subject to drug and alcohol testing." 71 Fed. Reg. at 1670. The petitioners nonetheless cite four "principles of statutory interpretation," Pet'rs Br. at 11, which, they contend, undermine the FAA's interpretation. We find none of them compelling.

The petitioners first assert the FAA's interpretation "would offend the basic principle that statutes 'must be harmonized'" because it "runs headlong into a robust congressional policy of promoting the nation's small businesses." Pet'rs Br. at 11 (quoting 82 CJS Statutes § 352; citing 15 U.S.C. § 631(a) ("It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns . . . .")). We note no disharmony in the FAA's regulation. The Congress has provided a specific statutory procedure under the RFA to ensure that "agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulation." RFA, Pub. L. No. 96-354, § 2(b), 94 Stat. 1164, 1165 (1980). This is the procedure which the Congress mandated to harmonize the express interest advanced in the Omnibus Act's testing provisions—"the interest of aviation safety," 49 U.S.C. § 45102(a)(1)—with the concerns of small businesses. If the FAA properly follows the procedure in its rulemaking—a matter we address *infra* Part II.D—it discharges its responsibility in this regard.

The petitioners next assert the FAA's interpretation will impermissibly " 'imping[e] upon important state interests,' " Pet'rs Br. at 11 (quoting *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 544 (1994)), because "extension of the federal government's drug-and-alcohol testing regime to noncertificated subcontractors necessarily will disrupt state choices about both (i) the privacy interests of local employees and (ii) the business prerogatives of local employers," *id*. (state statutory citations omitted). This argument fails, however, because the Omnibus Act expressly preempts state drug testing laws. *See* 49 U.S.C. § 45106(a) ("A State or local government may not prescribe, issue, or continue in effect a law, regulation, standard, or order that is inconsistent with regulations prescribed under this chapter.").

Third, the petitioners contend that the FAA's interpretation "would violate the rule that: 'A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score,' " relying on its contention that the 2006 Final Rule violates the Fourth Amendment. Pet'rs Br. at 12 (quoting *Almendarez-Torres v. United States,* 523 U.S. 224, 237 (1998)). As our discussion below reveals, however, the petitioners' Fourth Amendment challenge offers no "grave concerns" about the 2006 Final Rule's constitutionality. *See infra* Part II.C.

Finally, the petitioners assert the FAA's interpretation ignores the "context" of the legislation—namely, the "major legal and political concerns" that widespread drug testing of employees might raise, Pet'rs Br. at 13—and the Congress's own admonition that "the Administrator be very selective in extending the coverage of this provision to other categories of air carrier and FAA employees" and that "[the statute] should not be treated as an open authorization to test all aviation industry employees." S. Rep. No. 102-54, at 18 (May 2, 1991). In the quoted report, however, the Congress singled out

"mechanics" as among the employees required to be tested "[a]s defined in statute and regulation." *Id*. at 17. And nowhere does the legislative history distinguish between mechanics employed by certificated subcontractors and those employed by noncertificated subcontractors.

### 2. "Employees Responsible for Safety-Sensitive Functions"

Second, the petitioners assert that the FAA exceeded its statutory authority because noncertificated subcontractors' employees are not "employees responsible for safety-sensitive functions" as required under section 45102(a)(1). They argue that under FAA regulations, if "a certificated repair station has used a noncertificated subcontractor, only the certificated repair station is 'responsible' for the safety aspects of the subcontractor's work." Pet'rs Br. at 18 (citing 14 C.F.R. § 145.217(b)(2), (3) (requiring certificated repair station to verify satisfactory performance of subcontracted noncertificated work and airworthiness of aviation component before return to service)). The FAA responds that "responsible for" as used in section 45102(a)(1) does not mean "legally responsible for," as the petitioners argue, but simply "the "agent" or "cause," in this case denoting the person performing the maintenance work. FAA Br. at 26-27. The FAA's interpretation of the phrase "responsible for" is a permissible one. *See* Webster's Third New Int'l Dictionary 1935 (1993) (defining "responsible" as "answerable as the primary cause, motive, or agent"); *Hines v. Blue Cross Blue Shield of Va.*, 788 F.2d 1016, 1018 (4th Cir. 1986) ("The ordinary meaning of a 'person responsible for such injuries' is the person who caused the injuries, who did the damage."). Because the Congress expressly directed the FAA Administrator to determine by regulation those "other air carrier employees responsible for safety-sensitive functions," we defer to the FAA's interpretation. *See Envtl. Def. v. EPA*, 2007 WL 1745307, at *7 (D.C. Cir. 2007) (if Congress " 'has explicitly

left a gap for the agency to fill,' " we uphold agency's "reasonable statutory interpretation") (quoting *Chevron*, 467 U.S. at 843-44).

## B. Administrative Procedure Act

Next, the petitioners contend that requiring testing of maintenance employees of all subcontractors violates the APA in three respects. We disagree on all counts.

### 1. Notice

The petitioners contend the FAA's "mischaracterization" of the new regulatory language as a "clarification" "tainted all aspects of the rulemaking process with error," Pet'rs Br. at 29, and, in particular, "rendered the agency's notice of proposed rulemaking misleading and thus procedurally improper," *id*. at 32. There is some substance to the petitioners' claim that the inclusion in the 2006 Final Rule of the "subcontract at any tier" language is more than simply a "clarification," as the FAA repeatedly dubbed it. *See, e.g.*, 2006 Final Rule, 71 Fed. Reg. at 1666, 1667, 1668, 1669, 1670. The FAA concedes that its own informal guidance, to which it adhered until the mid-1990s, took the position that employees of noncertificated subcontractors did not have to be tested. *See* NPRM, 67 Fed. Reg. at 9369-70; 2006 Final Rule, 71 Fed. Reg. at 1670.[7] And it appears that any subsequent guidance to the contrary may not have been effectively disseminated. *See, e.g.*, SNPRM, 67 Fed. Reg. at 27,985 ("Although we believe that we are merely clarifying the regulations, we recognize that, due to the previous conflicting

---

[7]The 2006 Final Rule states: "As we acknowledged in the NPRM and SNPRM preambles, some of our early guidance only required subcontractors who took airworthiness responsibility to be subject to drug and alcohol testing. By the mid 1990s, the guidance we developed eliminated the airworthiness responsibility component and followed the rule language explicitly." 71 Fed. Reg. at 1670.

guidance, some companies with existing programs and some non-certificated contractors may have to modify their current alcohol misuse prevention and antidrug programs."). Thus, the additional language may more accurately be viewed as a choice between two conflicting positions than as a clarification. Nonetheless, the alleged "mischaracterization" does not warrant overturning the 2006 Final Rule. The FAA went out of its way to ensure that interested parties had the opportunity to participate and comment in the rulemaking—to the point of issuing the SNPRM seeking additional comment, and thereby delaying issuance of a final rule, precisely because of the conflicting guidance and possible consequent confusion. *See* SNPRM, 69 Fed. Reg. at 27,980-81. As a result, the entire air carrier industry, of which the petitioners are part, was well aware of the rulemaking and its substance and cannot reasonably claim ignorance of the proceeding or inadequate opportunity to comment. "If anything, [the FAA proceedings] provided Industry with a far greater opportunity to participate in the rulemaking than a plain vanilla notice-and-comment proceeding." *Natural Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 121 (D.C. Cir. 1987). Thus, "the parties had abundant opportunity to comment on the proposed rule" and "any error was harmless." *Id.*[8]

### 2. Arbitrary and Capricious Standard

The petitioners assert the 2006 Final Rule violates the APA's proscription against arbitrary and capricious rulemaking in two respects. First, they claim the 2006 Final Rule is

---

[8]The petitioners also contend the alleged mischaracterization resulted in "substantive analytical error," Pet'rs Br. at 32, asserting it affected the FAA's estimate of the Rule's costs to the industry. This issue can be resolved on remand when the FAA reexamines the economic impact of the Rule on small business entities under the RFA. *See infra* Part II.D.

arbitrary because it is inconsistent with the FAA's "overarching regulatory scheme" for maintenance and certification. Pet'rs Br. at 25. The petitioners maintain that because only certificated persons can perform maintenance under 14 C.F.R. § 43.3, employees of noncertificated subcontractors cannot perform "maintenance" but only "maintenance functions." But the FAA's regulations permit a certificated repair station to contract out maintenance work it would otherwise have performed provided the certificated entity performs an airworthiness "sign-off" on the work before the component is returned to service. *See* 14 C.F.R. § 145.217. The task performed by subcontractors is no less safety-sensitive for being contracted out to another entity.

Second, the petitioners contend the FAA did not adequately explain the need to test all subcontractors' employees. We disagree. As noted above, the FAA reasonably determined it "would be inconsistent with aviation safety" to treat employees of certificated and noncertificated contractors differently given that they all perform the safety-sensitive function of maintenance. 71 Fed. Reg. at 1670. Ensuring that front-line maintenance workers do not make errors on account of drug or alcohol use makes it less likely that such errors will compromise air safety.

The petitioners reply with four reasons they claim testing is not necessary. They first contend there is "no evidence that any accident has resulted from drug or alcohol use by any worker employed by any noncertificated subcontractor." Pet'rs Br. at 34-35. Nonetheless, they acknowledge that "testing has revealed drug and alcohol use in the past, and expanded testing will sometimes turn up such use among workers at the noncertificated subcontractor level." Pet'rs Br. at 34. Thus, it may be only a matter of time before an accident attributable to substance abuse occurs. We do not believe the FAA must—or should—wait until then. *Cf. Nat'l Fed'n of Fed. Employees v.*

*Cheney*, 884 F.2d 603, 610 (D.C. Cir. 1989) ("It is readily apparent that the Army has a compelling safety interest in ensuring that the approximately 2,800 civilians who fly and service its airplanes and helicopters are not impaired by drugs. Employees in each of the covered positions—air traffic controllers, pilots, aviation mechanics and aircraft attendants—perform tasks that are frought with extraordinary peril: A single lapse by any covered employee could have irreversible and calamitous consequences.").

The petitioners' second reason relates to their contention that the subcontractor testing requirement is redundant given the airworthiness review required to be performed by a certificated repair station that subcontracts a maintenance task. We do not believe, however, it is arbitrary to impose a second line of defense, involving the very employees performing the repairs, to further promote air carrier safety. *See* 2006 Final Rule, 71 Fed. Reg. at 1669 ("While there might be redundancies built into the maintenance system, the supervisory and other quality assurance processes involved in aviation maintenance do not constitute a substitute for the protections afforded by drug and alcohol testing. Therefore, we will continue to require subcontractors be subject to drug and alcohol testing.").[9]

The petitioners next reason that the FAA should have considered alternative "less restrictive forms of regulation." Pet'rs Br. at 36. The Supreme Court, however, has "made clear that the reasonableness of a particular technique does not

---

[9]Further, the claimed redundancy has always been present for noncertificated employees of a certificated contractor (or of an air carrier itself) who are subject to testing notwithstanding their work is checked by certificated employees. *See* 2006 Final Rule, 71 Fed. Reg. at 1669-70 ("Within certificated repair stations, there are non-certificated individuals such as mechanic's helpers, who have been subject to testing for more than 15 years.")

' "necessarily or invariably turn" ' on the existence of less intrusive alternatives," *Nat'l Fed'n of Fed. Employees*, 884 F.2d at 610 (quoting *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 629 n.9 (1989)).

Finally, the petitioners contend the 2006 Final Rule will have a "net *negative* safety impact," Pet'rs Br. at 37 (emphasis in original), because it will divert inspection resources from employees of certificated contractors and subcontractors and drive away both qualified, experienced noncertificated subcontractors and their skilled employees. The petitioners, however, offer no evidentiary support for this claim (nor did so before the FAA) and we therefore reject it.

### 3. Comments

The petitioners also contend the FAA failed to respond adequately to comments on the 2006 Final Rule's impact on industry business costs and employees' privacy costs. We conclude the FAA's response was adequate.

With regard to the industry costs, the petitioners rely in particular on an industry survey they submitted to the FAA, along with an analysis of it by "a distinguished aviation industry economist," Pet'rs Br. at 39, which they claim contradicts the FAA's assessment that "none of the commenters opposing the proposal provided specific data challenging the FAA's fundamental economic assumptions," 2006 Final Rule, 71 Fed. Reg. at 1667. Yet immediately following the quoted statement, the 2006 Final Rule went on to note that "[t]he regulatory evaluation accompanying this final rule specifically addresses the comments about costs and benefits." *Id*. In the cited evaluation, the FAA responded at length to the information the commenters submitted, finding, inter alia, that "most of the survey information" was not "useful or credible," JA 112, and rebutting the expert's opinions, JA 113-15.

With regard to employees' privacy interests, the petitioners assert the FAA ignored comments complaining that subjecting employees of all subcontractors to the testing requirements will "trigger[] countless invasions of privacy through the administration of preemployment, reasonable-suspicion, incident-based, and ongoing random testing, including for employees with flawless past work records and no hint of prior substance abuse." Pet'rs Br. at 41. Again, the FAA responded, albeit succinctly: "[T]he issues regarding invasion of privacy were resolved more than 15 years ago when the drug testing regulation carefully balanced the interests of individual privacy with the Federal government's duty to ensure aviation safety. The purpose of this rulemaking is not to reopen the long-settled issue of invasion of privacy." 71 Fed. Reg. at 1668. The petitioners respond that the 2006 Final Rule "presents much-heightened privacy concerns," Pet'rs Br. at 22, but do not explain precisely what the heightened concerns are or point to comments that do so. To the extent the purported expansion of the testing class affects privacy rights, we address this issue in our Fourth Amendment discussion. *See infra* Part II.C.

### *C. Constitutional Challenges*

The petitioners raise two constitutional challenges to the 2006 Final Rule, alleging the FAA violated the Due Process Clause of the Fifth Amendment and the Fourth Amendment's guarantee against unreasonable search and seizure. We reject each challenge in turn.

The petitioners first claim the 2006 Final Rule, insofar as it extends the testing to employees of noncertificated subcontractors, is so vague as to violate due process because it is unclear what constitutes "maintenance" for which testing is required—and, in particular, where the FAA draws the line between "maintenance" and "preventive maintenance," for which testing is not required. *See* 14 C.F.R. § 1.1 (defining "maintenance" as "inspection, overhaul, repair, preservation,

and the replacement of parts, but exclud[ing] preventive maintenance"). Whatever uncertainty exists regarding the meaning of "maintenance," however, existed before—and, according to the petitioners, was enhanced by guidance disseminated after— the 2006 Final Rule issued and is therefore not attributable to it. In any event, the court "allow[s] greater leeway for regulations and statutes governing business activities than those implicating the first amendment"—"no more than a reasonable degree of certainty can be demanded." *Throckmorton v. NTSB*, 963 F.2d 441, 445 (D.C. Cir. 1992) (internal quotations & citations omitted). In this case, employers can clarify the term's meaning as they always have—by recourse to the written guidance which the FAA routinely provides on testing issues raised by interested parties. *See, e.g.*, JA 175, 180; Pet'rs Br. at 27-28 (noting guidance on meaning of "maintenance" issued since 2006 Final Rule). Thus, "the regulated enterprise" has "the ability to clarify the meaning of the regulation by its own inquiry, or by resort to the administrative process." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).

The petitioners next contend the 2006 Final Rule's drug testing requirement subjects employees of noncertificated subcontractors to unreasonable searches in violation of the Fourth Amendment. Again we disagree.

In *National Federation of Federal Employees v. Cheney*, 884 F.2d 603 (D.C. Cir. 1989), the court upheld against a Fourth Amendment challenge the U.S. Army's practice of subjecting civilian aviation maintenance personnel to compulsory, random toxicological urine testing because the Army had a compelling interest in ensuring air safety given "the quintessential risk of destruction to life and property posed by aviation." 884 F.2d at 610. The same justification exists here. Nonetheless, the petitioners offer three grounds for finding the testing program unconstitutional.

First, the petitioners assert that the employees subject to testing are "ordinary citizens." The same is true, however, of the employees of certificated air carrier contractors and subcontractors and was true of the civilian employees in *National Federation*. Yet the petitioners do not suggest these groups may not constitutionally be tested.

Second, the petitioners object to the expansive scope of the testing insofar as it applies to all maintenance work, all employees who "participate" in the work and, especially, to current employees of noncertificated subcontractors. These objections applied as well to employees of a certificated contractor or subcontractor when they first became subject to testing in the late 1980s. Further, as to the first objection specifically, as indicated previously, the FAA can work out through guidance and consultation with subcontractors (as it has with certificated contractors and subcontractors) what is and is not test-triggering "maintenance" work. Further, as to the third objection, while testing of incumbents may as a general matter require a closer relationship between the employee's job and the government interest served than does testing of new applicants, *see Stigile v. Clinton,* 110 F.3d 801, 805-06 (D.C. Cir. 1997); *Willner v. Thornburgh*, 928 F.2d 1185, 1188 (D.C. Cir. 1991), the nexus between aircraft mechanical work and aviation safety is sufficient, as our decision in *National Federation* made clear.

Third, the petitioners argue, as earlier, that the additional testing "simply 'is not needed' " in light of the airworthiness testing all aviation components undergo before being placed in service. Pet'rs Br. at 46 (quoting *Chandler v. Miller,* 520 U.S. 305, 320 (1997)). We reject this argument here for the same reasons given earlier. *See supra* Part II.B.2. Because of "the quintessential risk of destruction to life and property" posed by substance impaired lapses by maintenance workers at any tier, the testing is justified under *National Federation*.

### *D. Regulatory Flexibility Act*

Last, we address the petitioners' RFA challenge. Under the RFA an agency required to file a notice of proposed rulemaking "shall prepare and make available for public comment an initial regulatory flexibility analysis," which "shall describe the impact of the proposed rule on small entities." 5 U.S.C. § 603(a). Along with the final rule, "the agency shall prepare a final regulatory flexibility analysis" which "shall contain," inter alia,

> **(2)** a summary of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments; [and]
>
> . . .
>
> **(5)** a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

*Id*. § 604(a). These requirements, however, "shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." *Id*. § 605(b).

In the NPRM, the FAA performed a tentative RFA analysis and counted among RFA small entities both air carriers and Part 145 repair stations but, because it was "unable to determine how many of the 2,412 part 145 repair stations are considered small

entities," it "call[ed] for comments and request[ed] that all comments be accompanied by clear documentation." 67 Fed. Reg. at 9376.

In the SNPRM, the FAA determined that "the small entity group is considered to be part 145 repair stations," 69 Fed. Reg. at 27,986, but still "unable to determine how many of the part 145 repair stations and their subcontractors are considered small entities," concluded that "[m]ost, if not all [non-certificated maintenance contractors] would be considered small entities," *id*. Based on its calculation of annualized costs of less than 1% of annual median revenue, the FAA stated it "believe[d] that this proposed action would not have a significant economic impact on a substantial number of small entities" but "solicit[ed] comments on this determination, on these assumptions, on the annualized cost per company, and on their annual revenue." *Id*.

After receiving comments, the FAA took a different tack in the 2006 Final Rule and "disagree[d]" with "commenters who raised RFA issues," asserting that contractors are not among entities regulated under the testing regulations for the purpose of the RFA. 71 Fed. Reg. at 1673. The FAA noted that "the directly regulated employers are: Air carriers operating under 14 CFR parts 121 and 135; § 135.1(c) operators; and air traffic control facilities not operated by the FAA or by or under contract to the U.S. military," who "must conduct drug and alcohol testing under the FAA regulations." *Id*. "For drug and alcohol testing purposes, certificated repair stations are contractors, and contractors are not regulated employers." *Id*. (citing 14 CFR pt. 121, app. I, § II (defining "employer"); *id*. app. J, § I(D) (same)). Accordingly, the FAA concluded it was "not required to conduct an RFA analysis, including considering significant alternatives, because contractors (including subcontractors at any tier) are not the 'targets' of the proposed regulation, and are instead indirectly regulated entities." *Id*. at 1674. The petitioners contend the FAA's determination is

incorrect. We agree with the petitioners that the contractors and subcontractors are regulated employers and that the RFA therefore requires that the FAA consider the economic impact of the 2006 Final Rule on them. In reviewing this conclusion, we do not defer to the FAA's interpretation of the RFA—and specifically whether contractors and subcontractors are "regulated" entities directly affected by the regulations—because the FAA does not administer the RFA. *See Am. Trucking Ass'ns v. EPA*, 175 F.3d 1027, 1044 (D.C. Cir. 1997) (no deference to EPA or SBA interpretation of RFA), *modified in other respect*, 195 F.3d 4 (D.C. Cir. 1999), *reversed in other respect*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001).

In making its determination, the FAA relied on a line of decisions in which this court held that under the RFA the regulating agency need consider only the economic impact of agencies directly affected and regulated by the subject regulations. We find the situation here materially different from the cases the FAA cites.

Initially, in *Mid-Tex Electric Cooperative v. FERC*, 773 F.2d 327 (1985), we reviewed a challenge by wholesale customers to a rule permitting utilities to recover costs and held that "FERC correctly determined that it need not prepare a regulatory flexibility analysis" because the regulated utilities, which were subject to the rule, were not small entities, while the wholesale customers, many of whom were small entities, were not regulated by the rule. 773 F.2d at 343. We explained "it is clear that Congress envisioned that the relevant 'economic impact' was the impact of compliance with the proposed rule on regulated small entities," *id*. at 342. That is, the RFA is satisfied if the agency determines "the rule will not have a significant economic impact on a substantial number of small entities that are *subject to the requirements of the rule*." *Id*. (emphasis added). As the court noted, the Congress "did not intend to require that every agency consider every indirect effect that any

regulation might have on small businesses in any stratum of the national economy." *Id.* at 343. In *Mid-Tex*, FERC was not required to consider the indirect economic affects on the wholesale customers of the utilities or on the ultimate retail consumers, neither of which was regulated by the challenged rule.

In *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 868-69 (D.C. Cir. 2001), our latest iteration of *Mid-Tex*, environmental groups and industry representatives challenged emission standards for hazardous waste combustors. The court rejected a cement manufacturer's argument that EPA incorrectly confined its RFA analysis to the economic effects on the hazardous waste combustion facilities, without considering the effect on generators of hazardous waste like itself. The court explained:

> EPA's rule regulates hazardous waste combustors, not waste generators. We explained in *Mid-Tex* that the language of the statute limits its application to the "small entities *which will be subject to the proposed regulation*"—that is, those "small entities *to which the proposed rule will apply." Mid-Tex Elec. Coop.,* 773 F.2d at 342 (quoting 5 U.S.C. § 603(b)) (first emphasis in *Mid-Tex*; second emphasis in original). Congress "did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any stratum of the national economy." *Id.* at 343.

255 F.3d at 869. The court further rejected the cement manufacturer's attempt to distinguish its situation "on the basis that EPA actually intended to affect the conduct of hazardous waste generators by raising the cost of incineration," stating:

> [A]pplication of the RFA does turn on whether particular entities are the "targets" of a given rule. The statute

requires that the agency conduct the relevant analysis or certify "no impact" for those small businesses that are "subject to" the regulation, that is, those to which the regulation "will apply."

*Id*. (quoting (*Mid-Tex,* 773 F.2d at 342; 5 U.S.C. § 603(b)(3)).

Unlike the parties claiming economic injury in the cited cases, contractors and subcontractors are directly affected and therefore regulated by the challenged regulations. It may be true that the regulations are immediately addressed to the employer air carriers which are in fact the parties certified to operate aircraft. *See* 14 C.F.R. pt. 121, app. I §§ I (B)-(C) (making "employer" responsible party for ensuring drug program is conducted properly), II (definition of "employer"); 14 C.F.R. pt. 121, app. J §§ I (B)-(C) ("employer" responsible for alcohol testing program), I (D) (definition of employer). Nonetheless, the regulations expressly require that the employees of contractors and subcontractors be tested. *See* 14 C.F.R. pt. 121, apps. I § III, J § II. Thus, the contractors and subcontractors (at whatever tier) are entities " '*subject to the proposed regulation*'—that is, those 'small entities *to which the proposed rule will apply.'* " Cement Kiln, 255 F.3d at 869 (quoting *Mid-Tex*, 773 F.2d at 342 (quoting 5 U.S.C. § 603(b))) (first emphasis in *Cement Kiln*; second emphasis in original). In other words, the 2006 Final Rule imposes responsibilities directly on the contractors and subcontractors and they are therefore parties affected by and regulated by it. The FAA acknowledged as much when it advised:

> If a contractor company has FAA-regulated testing programs, *it must ensure* any individual performing a safety-sensitive function by contract (including by subcontract at any tier) below it is subject to testing. The FAA recognizes there may be multiple tiers of subcontractors in the aviation industry. *Any lower tier contractor company* with FAA-regulated testing

> programs *will be held responsible* for its own compliance with the FAA drug and alcohol testing regulations. Also, there may be circumstances where *the regulated employer and higher tier contractor companies share responsibility* for the lower tier contractor company's noncompliance.

2006 Final Rule, 71 Fed Reg. at 1671-72 (emphases added). In fact, the FAA had it right in the NPRM and SNPRM when it determined that for the purpose of its RFA analysis the affected small entities should be considered to be Part 145 repair stations and their subcontractors. *See* 69 Fed. Reg. at 27,986. When the FAA abruptly changed course in the 2006 Final Rule, it went off course.

As a fall back, the FAA asserts that, in the event the court concludes contractors and subcontractors are directly regulated by the 2006 Final Rule, the FAA "substantially complied with" the RFA because it conducted initial evaluations (for the SNPRM) and a final economic evaluation of the effects on the industry, responding to comments following the SNPRM. The final evaluation, however, was not a "final regulatory flexibility analysis" pursuant to the RFA as the FAA determined that contractors and subcontractors are not regulated entities for the purpose of the RFA. *See* 71 Fed. Reg. at 1673; JA 155. Further, the RFA expressly requires that the final regulatory flexibility analysis explain "why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. § 604(a)(5). The evaluation on which the FAA relies, however, states unequivocally: "[N]o alternatives were considered," JA 100. The RFA is a procedural statute setting out precise, specific steps an agency must take. The FAA offers no authority to support its "substantial compliance" theory and we are aware of none. Accordingly we reject this argument as well.

For the foregoing reasons, we uphold the substance of the FAA's 2006 Final Rule and remand for the limited purpose of conducting the analysis required under the Regulatory Flexibility Act, treating the contractors and subcontractors as regulated entities.[10]

*So ordered.*

---

[10]In light of the public's manifest interest in aviation safety, we will not defer enforcement of the rule against small entities pending the FAA's Regulatory Flexibility Act analysis. *See* 5 U.S.C. § 611(a)(4)(B).

SENTELLE, *Circuit Judge*, dissenting: I respectfully dissent from the majority's holding that the Omnibus Transportation Employee Testing Act authorizes the FAA to require drug and alcohol testing of employees who perform the enumerated functions "directly or by contract (including by subcontract at any tier)." 2006 Final Rule, 71 Fed. Reg. 1666, 1676, 1677 (Jan. 10, 2006); *see* Maj. Op. at 7-15. I would therefore grant the petitions and vacate the 2006 Final Rule.

As originally enacted in 1991, the Act provided that the FAA "shall" require drug and alcohol testing of "airmen, crewmembers, airport security screening contract personnel, and other air carrier employees responsible for safety-sensitive functions . . ." Pub. L. No. 102-143, tit. v, § 3, 105 Stat. 917, 953 (Oct. 28, 1991) (codified at 49 U.S.C. app. 1434; recodified, as amended, at 49 U.S.C. § 45102(a)(1)). To find statutory authority for the Rule, the FAA must argue that employees of subcontractors "at any tier" are "air carrier employees" under the Act. I think it is plain that they are not, and therefore cannot join my colleagues in holding that the Act is ambiguous under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

The question is whether "Congress has directly spoken to the precise question at issue." *Id.* at 842. To my mind, the plain language of the statute forecloses the interpretation urged by the FAA. An employee is "[a] person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." BLACK'S LAW DICTIONARY 543 (7th ed. 1999). This is not the only meaning of the word, but "definitional possibilities" do not alone create ambiguity. *See California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004) ("*CAISO*") (citing *Brown v. Gardner*, 513 U.S. 115, 118 (1994)). Here, we need not canvass all known uses of the word "employee" to know that an

employee of a subcontractor performing work for a contractor which in turn has a contract with an air carrier is not, in an ordinary sense, an "air carrier employee." And the Final Rule does not stop at that – it applies to employees of subcontractors "at any tier."

The majority argues that because the original Act authorized testing of certain contractors' employees (namely, "airport security screening contract personnel"), the subsequent phrase "and *other* air carrier employees" may be read to include *other* contractors' and subcontractors' employees. *See* Maj. Op. at 8-9. Because "employee" is not easily defined to encompass an employee of an air carrier's contractor's subcontractor, this is not a natural reading of the statute. Where "the text and reasonable inferences from it give a clear answer against the government . . . that . . . is 'the end of the matter.'" *CAISO*, 372 F.3d at 401 (quoting *Brown*, 513 U.S. at 120). To the extent that statutory context may fairly illuminate the reach of "air carrier employee," the reasonable inference from the phrase "airport security screening contract personnel" is that where Congress intended the Act to reach non-air carrier employees, it said so explicitly.

The FAA supports its interpretation by asserting that Congress gave it broad authority to prescribe regulations the FAA "finds necessary for safety in air commerce" and to require drug testing "[i]n the interest of aviation safety." 49 U.S.C. §§ 44701(a)(5); 45102(a)(1). No doubt the Final Rule is intended to promote safety, but Congress's mandate does not give the FAA carte blanche to pursue that goal. *See Michigan v. EPA*, 268 F.3d 1075, 1084 (D.C. Cir. 2001). The FAA's authority to require drug testing is defined by statute, and in my view the FAA has exceeded that statutory authority here.