In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3545

WHITE EAGLE COOPERATIVE
ASSOCIATION, et al.,

*Plaintiffs-Appellants,*

*v.*

CHARLES F. CONNER, Acting
Secretary, United States Department
of Agriculture, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 05 C 620—**Allen Sharp,** *Judge.*

ARGUED MAY 15, 2008—DECIDED JANUARY 12, 2009

Before RIPPLE, KANNE and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* The plaintiffs brought this action against the United States Department of Agriculture ("USDA" or "the Government"), challenging the USDA's rulemaking process and a resulting amendment to the Mideast Milk Marketing Order. The plaintiffs alleged

violations of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 et seq.; the USDA's rules of practice, 7 C.F.R. § 900.1 et seq.; the Administrative Procedure Act, 5 U.S.C. § 551 et seq.; the Regulatory Flexibility Act, 5 U.S.C. § 601 et seq.; and the Fifth Amendment's Due Process Clause. A number of dairy producers who supported the regulatory changes intervened to defend the amended rule and the adoption process. The district court granted summary judgment to the USDA and the intervenors on all counts. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

White Eagle Cooperative Association is a cooperative made up of milk producers. Together with the other milk producers (collectively, "White Eagle"), they challenge the USDA's rulemaking process and the resulting change to the Mideast Milk Marketing Order. At the outset, in order to assist our readers in understanding White Eagle's challenges, we must discuss briefly the dairy industry and its market forces as well as the relevant regulatory structure.[1]

---

[1] Our discussion borrows heavily from *Lamers Dairy, Inc. v. USDA*, 379 F.3d 466 (7th Cir. 2004). For additional background discussions, see *Zuber v. Allen*, 396 U.S. 168, 172-74 (1969); *Alto Dairy v. Veneman*, 336 F.3d 560, 562 (7th Cir. 2003); and *Stew Leonard's v. Glickman*, 199 F.R.D. 48, 49-50 (D. Conn. 2001).

## A. The Dairy Industry

In the dairy industry, dairy farmers, also referred to as "producers," sell raw milk to "handlers." Handlers, in turn, prepare the milk product for resale to consumers or serve as intermediaries to those who do. Consumer dairy products, such as fluid milk beverages, ice cream and cheese, can all be produced from "Grade A" or "fluid grade" raw milk. In the consumer market, however, milk beverages generally command a higher price than non-fluid products, which are known also as "manufactured dairy products." Consequently, the market into which dairy farmers sell their product values more highly (and pays a premium price for) Grade A milk ultimately used to produce beverage milk. This market premium based on end use creates an incentive among producers to divert their Grade A product to fluid milk handlers. Were this incentive not controlled, lower market prices would result from the increased supply, thereby harming milk production revenues.[2]

The dairy industry also is characterized by daily and seasonal fluctuations in supply and demand. Consumer demand fluctuates significantly on a daily basis, primarily due to consumer buying patterns. On the other hand, milk production, while relatively constant on a daily basis, does vary seasonally: In fall and winter months, less milk is produced; in spring and summer months, more milk is

---

[2] *See Alto Dairy*, 336 F.3d at 563 ("Such a diversion, what economists call 'arbitrage,' would undermine and, if uncontrolled, . . . reduce the incomes of dairy farmers as a group.").

produced. Consequently, to meet consumer demand in the winter, producers must maintain large herds, but these herds result in a surplus of milk in the summer months. Given the perishable nature of milk, handlers historically were able to obtain summer supplies at bargain prices.

## B. The Regulatory Scheme

In the wake of the Great Depression, in an attempt to address these unique industry characteristics, Congress enacted various provisions governing the dairy industry as part of the Agricultural Marketing Agreement Act of 1937 ("the AMAA"). The driving purpose of the AMAA was "to remove ruinous and self-defeating competition among the producers and permit all farmers to share the benefits of fluid milk profits according to the value of goods produced and services rendered." *Zuber v. Allen*, 396 U.S. 168, 180-81 (1969). The AMAA, as amended, thus ensures that producers receive a uniform minimum price for their product, regardless of the end use to which it is put.

To accomplish this objective, the statute contains several mechanisms. First, it authorizes the Secretary to classify milk according to its end use and to establish minimum prices for each end-use classification. *See* 7 U.S.C. § 608c(5)(A). Second, it authorizes the Secretary to establish a uniform minimum price, termed the "blend price," based on a weighted average of all units of production of classes of milk sold to handlers associated with a marketing area. *See id.* Third, it requires handlers to pay

producers the blend price, regardless of the end use to which the milk will be put. *See id.* § 608c(5)(B). Fourth, it authorizes a method for adjustments in payments among handlers so that the final amount paid by each handler equals the value of the milk that the handler has purchased, according to the minimum prices established. *See id.* § 608c(5)(C). As we shall explain more precisely in the following paragraphs, the provisions attempt to promote orderly milk-marketing by maintaining minimum prices for producers and limiting the competitive effects of excess supply of Grade A milk.

Although it protects producers, the AMAA regulates handlers only. Pursuant to the AMAA directives, the Secretary has classified milk into the following classes of utilization: Class I milk includes fluid milk processed and bottled as a beverage; Class II milk includes soft milk products such as cottage cheese, sour cream, yogurt and ice cream; Class III includes hard cheese and cream cheese; and Class IV includes raw milk used for butter and dry milk powder. As directed by the AMAA, the Secretary has established a uniform pricing scheme for each of these classes of milk, as well as the average blend price. Handlers governed by milk-marketing orders must pay producers this uniform blend price. The process of blending the prices of the different classes of milk on a monthly basis has come to be known as "pooling."

This uniform minimum pricing is intended to reduce the incentive that producers otherwise would have to divert all fluid milk to Class I handlers and, literally, to flood

that market. As the system operates, dairy producers within a marketing area receive the guaranteed uniform blend price for their milk, regardless of the end use to which it is put. Because the uniform price is a weighted average, some handlers pay producers less for the milk they purchase than its market value while other handlers pay more. Handlers who pay less to producers must make compensating payments into the producer settlement fund; handlers who pay more to producers may withdraw compensating payments from the fund. Thus, within the regulatory scheme, handlers ultimately pay an amount equal to the utilization value of the milk they purchase. This simplified example of the regulatory scheme by the United States District Court for the District of Connecticut is helpful:

> Suppose Handler A purchases 100 units of Class I (fluid) milk from Producer A at the minimum value of $3.00 per unit. Assume further that Handler B purchases 100 units of Class II (soft milk products) milk from Producer B at the minimum value of $2.00 per unit, and that Handler C purchases 100 units of Class III (hard milk products) milk from Producer C at $1.00 per unit. Assuming that this constitutes the entire milk market for a regulatory district, during this period the total price paid for milk is $600.00, making the average price per unit of milk $2.00. Thus, under the regulatory scheme, Producers A, B, and C all receive $200.00 for the milk they supplied, irrespective of the use to which it was put. However, Handler A must, in addition to the $200.00 that it must tender to Producer A, pay $100.00 into the settlement fund

> because the value of the milk it purchased exceeded the regulatory average price. Along the same vein, Handler C will receive $100.00 from the settlement fund because it will pay Producer C more than the milk it received was worth.

*Stew Leonard's v. Glickman*, 199 F.R.D. 48, 50 (D. Conn. 2001). The system of compensating payments into and out of the settlement fund thereby fulfills the AMAA requirement that "the total sums paid by each handler shall equal the value of the milk purchased by him at the prices fixed." 7 U.S.C. § 608c(5)(C).

The country is divided into regional milk-marketing areas, which are governed by different milk-marketing orders. White Eagle is part of the USDA's Mideast Milk Marketing Order ("Mideast Order"), which includes portions of Indiana, Ohio, Michigan, West Virginia, Kentucky and Pennsylvania. Milk marketing orders provide the details for fixing and enforcing minimum classified prices that regulated plants and handlers must pay for the milk they buy on a monthly basis. A marketing order defines "pool plants" in order to identify the plants that must pay classified prices and contribute to the revenue pool. *See* 7 C.F.R. § 1033.7. Similarly, marketing orders define "producer" and "producer milk" in order to identify the producers and the farm milk that may share in the market's blend price. *See* 7 C.F.R. §§ 1033.12, 1033.13. These rules are termed collectively "pooling standards." These standards determine whether a particular milk supply should be included in the calculation of the blend price and, relatedly, whether the

producer of that milk supply is entitled to receive the blend price.

The regulation at issue here concerns, inter alia, "diversion limits." A diversion limit is the maximum percentage of milk that a handler may divert to "nonpool plants" (i.e., plants that do not service the region's Class I fluid milk needs) without the milk being disqualified from treatment as "producer milk" and from the attendant entitlement to participation in the pool. *See* 7 C.F.R. § 1033.13(d)(4). If the amount of milk diverted to a nonpool plant in a given month exceeds the diversion limit, then the over-diverted milk is excluded from the pool and is not entitled to the blend price. *See id.* Such limits prevent the inclusion in the pool of excessive quantities of milk diverted to nonpool plants; indeed, excessive quantities of diverted milk often reflect opportunistic marketing rather than a surplus of the milk that regularly services a region's needs. *See, e.g.*, 70 Fed. Reg. 43335, 43338, 43340-41 (July 27, 2005).

## C.  The Challenged Rulemaking

In February 2005, in response to requests for amendments to the Mideast Order's pooling standards, the USDA invited interested parties to submit proposals and initiated formal rulemaking. *See* 70 Fed. Reg. 8043 (Feb. 17, 2005) (hearing notice); 70 Fed. Reg. 10337 (Mar. 3, 2005)

(amended notice).[3] The measures proposed included: (1) prohibiting simultaneous pooling of the same milk under both the Mideast Order and a State marketing order, (2) increasing performance standards for supply plants, and, most relevant here, (3) lowering diversion limit standards for "producer milk" by ten percentage points seasonally. 70 Fed. Reg. at 8044.

In March 2005, the USDA conducted a four-day evidentiary hearing on the proposals. Interested parties, including White Eagle, submitted both testimony and documentary evidence. *See* 70 Fed. Reg. at 43337-38. The USDA also received post-hearing briefs from interested parties, including White Eagle. *Id.* at 43340. In its oral and written submissions, White Eagle opposed the lowering of the diversion limit standards.

In July 2005, the USDA issued a "tentative partial decision on an interim final and emergency basis" ("interim decision" or "proposed interim rule"). *See* 70 Fed. Reg. 43335. At this time, the USDA both submitted the proposed regulation for the producers' referendum and also invited public comment on it. *See* 70 Fed. Reg. at 43335,

---

[3] The hearing notice stated that "Department employees involved in the decision-making process are prohibited from discussing the merits of the hearing issues on an ex parte basis with any person having an interest in the proceeding." It also advised that, "[f]or this particular proceeding, the prohibition applies to employees in the following organizational units: . . . the Office of the Market Administrator of the Mideast Milk Marketing Area." 70 Fed. Reg. at 8048.

43336. The decision adopted the proposals to prohibit simultaneous pooling and to tighten supply-plant standards, 70 Fed. Reg. at 43341, 43342 (proposed amendments to 7 C.F.R. § 1033.7 and § 1033.13(e)), as well as the proposal to reduce diversion limits for "producer milk" from 60% to 50% of a handler's receipts for the months of August through February, and from 70% to 60% for the months of March through July. *Id.* (proposed 7 C.F.R. § 1033.13(d)(4)).

The USDA's decision reasoned that lower diversion limits were necessary because the Mideast Order's then-existing pooling standards were failing to "reasonably accomplish" the Order's "fundamental objective" of properly identifying those producers who ought to share in the economic benefits of the pool. 70 Fed. Reg. at 43340. The decision explained that "[t]he Federal milk order system has consistently recognized that there is a cost incurred by producers in servicing an order's Class I market." *Id.* It concluded that it was clear from the hearing record that, due to inadequate diversion limits, the milk of producers who do not regularly bear those costs was nevertheless receiving the Order's blend price, resulting in the "unwarranted lowering of returns" to producers willing to regularly and consistently service the market's fluid needs. *Id.* The decision explained that the proposed provisions would "ensure that milk pooled on the order is part of the legitimate reserve supply of [the region's] Class I handlers," *id.* at 43341, and thereby "ensure the more equitable sharing of revenue generated from Class I sales among the appropriate producers," *id.* at 43340.

Two months later, on September 26, 2005, the USDA announced that the proposed provisions had been approved by the producers and that the interim rule amending the Mideast Order would become effective October 1, 2005. *See* 70 Fed. Reg. 56111 (Sept. 26, 2005). Also on September 26, 2005, White Eagle filed exceptions to the interim rule. Shortly thereafter, White Eagle sent a letter to the USDA suggesting a conflict of interest in the rulemaking process. The letter alleged that the employees of the Mideast Milk Marketing Area ("Dairy Program employees"), who had participated in the rulemaking process, may have tainted the administrative proceeding. It alerted the Secretary to the possibility that Dairy Program employees "could be influenced by the wishes of dominant producer groups, upon whose continued favor the professional future of career civil servants depends." R.84, ¶ 49 (internal quotation marks omitted). In essence, White Eagle's complaint is that, because these individuals would not have a job in the absence of a milk marketing order, and because the majority of producers in a region can vote to terminate an order, the employees are biased in favor of the "majority view" with respect to any proposed amendment.

In January 2006, the agency issued a partial final decision ("non-interim decision") to replace the interim rule. The decision fully adopted the interim rule; it also added a plant pooling restriction, subject to referendum. *See* 71 Fed. Reg. 3435 (Jan. 23, 2006) (final agency decision proposing final rule), 3440-41. Following a successful referendum vote by the producers, that decision became a final

rule effective May 1, 2006. *See* 71 Fed. Reg. 20335 (Apr. 20, 2006) (final rule).

## D.  District Court Proceedings

Soon after the interim rule was published, White Eagle filed an initial complaint in the district court challenging the USDA's decision and rule. After the USDA's final decision was issued, White Eagle amended its complaint to incorporate several new claims. The six-count complaint contained the following allegations: (1) the USDA had violated the Due Process Clause of the Fifth Amendment by allowing employees of the Office of the Market Administrator of the Mideast Milk Marketing Area to participate in the decisionmaking process; (2) the USDA had violated the Regulatory Flexibility Act ("RFA") by failing to undertake an analysis under the RFA and failing to support its RFA certification with any factual support; (3) the USDA violated the Administrative Procedure Act ("APA") by failing to provide factual support for its emergency rule making; (4) the Secretary of the USDA improperly had delegated rulemaking authority to the Administrator of the Agricultural Marketing Service in violation of the APA; (5) the USDA had violated the AMAA by considering the end use of Class I milk in formulating the amendment to the milk marketing order; and (6) the final partial decision on diversion limits was made without adequate record support as required by the APA. The Dairy Farmers of America ("DFA"), Dean Foods and others intervened in support of the rule.

The parties then filed cross-motions for summary judgment. Following a hearing in March 2007, the district court granted the defendant's and the defendants-intervenors' motions for summary judgment and denied the plaintiffs' motions. The district court determined that the USDA's rulemaking was conducted in accord with all relevant provisions of the APA. Additionally, the court held that, although the plaintiffs, as producers, had standing to challenge the USDA's regulatory-flexibility determination, the USDA had not violated the RFA in certifying that the rule would not affect disproportionately small businesses. Finally, the district court held that the amendment did not violate the substantive provisions of the AMAA.

White Eagle timely appealed.

## II

## DISCUSSION

We review de novo the district court's grant of summary judgment. *Lamers Dairy*, 379 F.3d at 472. All facts are drawn and all inferences viewed in the light most favorable to the nonmoving party. *Id.* Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(c).

The APA sets forth the limited review that a court may undertake when a regulation is challenged. Specifically, an agency action shall be set aside only if the court finds that it is:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2). The arbitrary and capricious standard is a deferential one that "presumes that agency actions are valid as long as the decision is supported by a 'rational basis.'" *Pozzie v. U.S. Dep't of Housing & Urban Dev.*, 48 F.3d 1026, 1029 (7th Cir. 1995); *see Mt. Sinai Hosp. Med. Ctr. v. Shalala*, 196 F.3d 703, 709 (7th Cir. 1999) (explaining that there must be a "rational relationship between the facts as the [Secretary] finds them and [his] ultimate conclusion" (internal quotation marks omitted)). A factual finding satisfies the substantial evidence standard if the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *CAE, Inc. v. Clean Eng'g, Inc.*, 267 F.3d 660, 675 (7th Cir. 2001) (quoting *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938)).

These standards do not allow a court to substitute its judgment for that of the agency. *See, e.g.*, *Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947, 953 (7th Cir. 2000). Moreover, we are particularly circumspect when reviewing challenges to agency actions within complex administrative schemes such as milk-marketing. *Lamers Dairy*, 379 F.3d at 473.

With these standards in mind, we turn to the challenges levied by White Eagle against the amended milk marketing order.

**A.**

White Eagle first contends that the USDA violated the APA and the Due Process Clause of the Fifth Amendment when it allowed Dairy Program employees to participate in the rule's decisionmaking process. In White Eagle's view, it was in the interest of Dairy Program employees to adopt proposed changes to marketing orders if those changes were supported by the majority of producers. White Eagle reasons that Dairy Program employees do not want to upset producers, who, by majority vote, may terminate a milk marketing order[4]

---

[4] 7 U.S.C. § 608c(16)(B) states:

(B) The Secretary shall terminate any marketing agreement entered into under section 608b of this title, or order issued under this section, at the end of the then current marketing period for such commodity, specified in such

(continued...)

thereby placing the jobs of Dairy Program employees at risk. Consequently, the employees' participation in the rulemaking was improper.

The district court concluded that the claim was procedurally barred because White Eagle had not raised the issue in a timely fashion. Specifically, at the time of the initial notice of proposed rulemaking in February 2005, White Eagle was aware that employees of the Office of the Market Administrator of the Mideast Milk Marketing

---

[4] (...continued)

marketing agreement or order, whenever he finds that such termination is favored by a majority of the producers who, during a representative period determined by the Secretary, have been engaged in the production for market of the commodity specified in such marketing agreement or order, within the production area specified in such marketing agreement or order, or who, during such representative period, have been engaged in the production of such commodity for sale within the marketing area specified in such marketing agreement or order: Provided, That such majority have, during such representative period, produced for market more than 50 per centum of the volume of such commodity produced for market within the production area specified in such marketing agreement or order, or have, during such representative period, produced more than 50 per centum of the volume of such commodity sold in the marketing area specified in such marketing agreement or order, but such termination shall be effective only if announced on or before such date (prior to the end of the then current marketing period) as may be specified in such marketing agreement or order.

Area would participate in the decisionmaking process; however, White Eagle did not raise any objection until September 26, 2005. Consequently, White Eagle had failed to file a timely affidavit disclosing the conflict to the agency as required by 5 U.S.C. § 556(b)(3).[5]

Section 556(b) of Title 5 requires an agency to consider and determine issues of bias "[o]n the filing in good faith of a timely and sufficient affidavit" raising the issue. As

---

[5] Section 556 sets forth the requirements for hearings conducted as part of the rulemaking process; it states in relevant part:

(b) There shall preside at the taking of evidence--

(1) the agency;

(2) one or more members of the body which comprises the agency; or

(3) one or more administrative law judges appointed under section 3105 of this title.

This subchapter does not supersede the conduct of specified classes of proceedings, in whole or in part, by or before boards or other employees specially provided for by or designated under statute. The functions of presiding employees and of employees participating in decisions in accordance with section 557 of this title shall be conducted in an impartial manner. A presiding or participating employee may at any time disqualify himself. *On the filing in good faith of a timely and sufficient affidavit of personal bias or other disqualification of a presiding or participating employee, the agency shall determine the matter as a part of the record and decision in the case.*

5 U.S.C. § 556(b) (emphasis added).

the Court of Appeals for the District of Columbia has explained, the rule that claims of bias must be timely protects the efficiency and integrity of the administrative process, as well as the reputations of the parties involved:

> If the issue of bias is raised in a timely fashion, permitting more prompt attention to the matter, each party's rights to a fair and impartial tribunal are better protected. On the other hand, when a party voices its misgivings in tardy or dilatory fashion, not only may time and effort be wasted in the event that disqualification is ultimately required, but the good faith of the claimant will quite naturally be placed in some doubt.

*Marcus v. Dir., Office of Workers' Comp. Programs*, 548 F.2d 1044, 1050 (D.C. Cir. 1976); *see also Power v. Fed. Labor Relations Auth.*, 146 F.3d 995, 1002 (D.C. Cir. 1998) (applying rationale to proceeding before the NLRB).

In the present case, the original notice of proposed rule making, in February 2005, informed interested parties that employees of the Office of the Market Administrator of the Mideast Milk Marketing Area would be participating in the decisionmaking process. *See* 70 Fed. Reg. at 8048. However, despite White Eagle's notice of the proposed rulemaking, its participation in a four-day hearing in March 2005, its filing of supplemental briefs after the hearing and its notice of the proposed rule in July 2005, it did not raise any issue with respect to the employees' participation until September 2005, when the interim final rule was published.

White Eagle does not contest directly its failure to meet the requirement of 5 U.S.C. § 556(b) that claims of bias be raised in a timely manner. It tacitly admits that it was in "technical noncompliance" with the statute. Reply Br. 21. Nevertheless, it believes that this failure should be forgiven because the matter that it raised was a "structural conflict inherent in the process." Appellant's Br. 39 n.32.[6]

White Eagle's claim of bias focuses on the participation of the employees in the decisionmaking process. When it first raised its claim, the employees already had participated in vital aspects of that process, namely the taking and considering of evidence and the formulating of an amended rule. Entertaining White Eagle's claim of bias under these circumstances would raise the con-

---

[6] White Eagle also states, without elaboration, that the Agency "eventually disclosed its reasons and basis for allowing employees . . . to participate" and, therefore, determined "the matter as a part of the record and decision in the case." Reply Br. 21. It is unclear what White Eagle would like us to draw from this statement—that its letter substantially complied with the APA, that the Government waived any objection, or some other conclusion. However, it is not the province of the courts to complete litigants' thoughts for them, and we will not address this undeveloped argument. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).").

cerns—with respect to administrative integrity and White Eagle's motives—that Section 556(c)'s requirement of a timely affidavit was meant to quell. As explained by the court in *Marcus*:

> It will not do for a claimant to suppress his misgivings while waiting anxiously to see whether the decision goes in his favor. A contrary rule would only countenance and encourage unacceptable inefficiency in the administrative process. The APA-mandated procedures afford every party ample opportunity to enforce and preserve its due process rights. Under the present circumstances, however, petitioner must be deemed to have waived his claim.

548 F.2d at 1051. Having failed to raise the bias claim in a timely fashion, White Eagle waived its right to do so.

**B.**

White Eagle next contends that the USDA, in adopting the amendments to the Mideast Milk Marketing Order, violated the RFA. The RFA was adopted to "encourage administrative agencies to consider the potential impact of nascent federal regulations on small business." *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 111 (1st Cir. 1997). Under the RFA, an agency that publishes a notice of proposed rulemaking must prepare an initial regulatory flexibility analysis describing the effect of the proposed rule on small businesses and discussing alternatives that might minimize adverse economic consequences. *See* 5 U.S.C. § 603. The initial analysis must

include: (1) a description of the reasons for the proposed action; (2) a succinct statement of the proposed rule's objectives and legal basis; (3) a description of, and the number of, small entities "to which the proposed rule will apply"; and (4) a description of the "compliance requirements" of the proposed rule, "including an estimate of the classes of small entities which will be subject to the requirement." *Id.* § 603(b)(1)-(4). When promulgating a final rule, the agency not only must address the regulatory flexibility comments submitted by the public, it also must include "a description for the steps the agency has taken to minimize the significant economic impact on small entities consistent with the state objectives of applicable statutes." *Id.* § 604(a). However, Section 605 provides that this analysis need not be performed "if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities"; if an agency head makes this certification, however, he also must "provid[e] the factual basis for such certification." 5 U.S.C. § 605.

White Eagle contends that the Government violated the RFA by failing to undertake a regulatory flexibility analysis and by employing the certification option without sufficient factual support. In response, the Government and intervenors claim that White Eagle cannot challenge the agency's compliance with the RFA because White Eagle's conduct is not the subject of the Mideast Marketing Order. They submit that the Order, including the modified diversion limit at issue here, regulates the conduct only of handlers—not producers. They argue that, because White Eagle is an association of producers, not

handlers, White Eagle lacks standing to challenge the agency's compliance with the RFA.

We have not had occasion to consider who may bring a challenge to a regulatory flexibility analysis or certification under the RFA. The Court of Appeals for the District of Columbia, however, has developed a body of case law in this area. Our colleagues in that circuit first considered the issue in *Mid-Tex Electric Co-op, Inc. v. Federal Energy Regulatory Commission*, 773 F.2d 327 (D.C. Cir. 1985). At issue in *Mid-Tex Electric* was a proposed rule that would have allowed electric utilities to include in their rate bases certain capital-improvement costs for projects currently under construction. With respect to the proposed rule, the Commission certified that its proposed rule would not have a significant impact on a substantial number of small entities because "virtually all of the utilities it regulate[d] d[id] not fall within the meaning of the term 'small entities' as defined in the RFA." *Id.* at 341. Wholesale customers of the utilities challenged this certification; they claimed that the Commission, in promulgating the rule, was required "to consider[] the impact of the proposed rule on wholesale and retail customers of the jurisdictional entities subject to rate regulation by the Commission." *Id.* (internal quotation marks and citations omitted). The Commission, however, maintained that it was not required to consider the effect of the rule on "non-jurisdictional entities whose rates are not subject to the rule." *Id.* The court of appeals agreed with the Commission. It observed that Congress was prompted to pass the RFA by the "high cost to small entities of compliance with uniform regulations." *Id.* at 342. The

remedy Congress fashioned in response was "careful consideration of those costs in [a] regulatory flexibility analys[is]," an analysis, the court observed, which was "limited to small entities subject to the proposed regulation." *Id.* The court further explained:

> We find a clear indication of this limitation in section 603 of the statute, which specifies the contents of initial regulatory flexibility analysis. These initial analyses are to include "a description of and, where feasible, an estimate of the number of small entities *to which the proposed rule will apply*," 5 U.S.C. § 603(b)(3) (emphasis added), and "a description of the projected reporting, recordkeeping and other *compliance requirements* of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement." 5 U.S.C. § 603(b)(4) (emphasis added). Since the scope of the final regulatory flexibility analysis is limited to the issues raised by the initial analysis, it is clear that Congress envisioned that the relevant "economic impact" was the *impact of compliance with the proposed rule on regulated small entities*. Reading section 605 in light of section 603, we conclude that *an agency may properly certify that no regulatory flexibility analysis is necessary when it determines that the rule will not have a significant economic impact on a substantial number of small entities that are subject to the requirements of the rule.*

*Id.* at 342 (emphasis added).

The District of Columbia Circuit also had occasion to consider a similar challenge under the RFA in *Cement Kiln*

*Recycling Coalition v. EPA*, 255 F.3d 855 (D.C. Cir. 2001). *Cement Kiln* concerned a proposed rule that made more stringent the emission limits for hazardous waste combustors. The plaintiff challenged the proposed regulation on various grounds, including that the EPA had failed to meet the requirements of the RFA because the agency had not conducted an RFA analysis to determine its impact on small businesses that were generators of hazardous waste (as opposed to hazardous waste combustors). Again, the court rejected the claim:

> As to Continental's second claim regarding generators of hazardous waste, *this court has consistently rejected the contention that the RFA applies to small businesses indirectly affected by the regulation of other entities.* EPA's rule regulates hazardous waste combustors, not waste generators. We explained in *Mid-Tex* that the language of the statute limits its application to the "small entities which will be subject to the proposed regulation"—that is, those "small entities to which the proposed rule will apply." *Mid-Tex Elec. Coop.*, 773 F.2d at 342 (quoting 5 U.S.C. § 603(b)). Congress "did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any stratum of the national economy." *Id.* at 343.

> Continental acknowledges these precedents, but seeks to distinguish this case on the basis that EPA actually intended to affect the conduct of hazardous waste generators by raising the cost of incineration. This increase in cost would create an economic incentive to minimize waste production. . . .

> Contrary to what Continental supposes, application of the RFA does turn on whether particular entities are the "targets" of a given rule. The statute requires that the agency conduct the relevant analysis or certify "no impact" for those small businesses that are "subject to" the regulation, that is, those to which the regulation "will apply." *Mid-Tex Elec. Coop.*, 773 F.2d at 342; 5 U.S.C. § 603(b)(3). EPA's rule applies, by its terms, only to HWCs. The rule will doubtless have economic impacts in many sectors of the economy. *But to require an agency to assess the impact on all of the nation's small businesses possibly affected by a rule would be to convert every rulemaking process into a massive exercise in economic modeling, an approach we have already rejected. See Mid-Tex Elec. Coop.*, 773 F.2d at 343.

*Cement Kiln Recycling Coal.*, 255 F.3d at 869 (emphasis added).

The District of Columbia Circuit most recently revisited the issue in *Aeronautical Repair Station Association, Inc. v. FAA*, 494 F.3d 161 (D.C. Cir. 2007). Before the court was a challenge to the FAA's drug and alcohol testing rule which had been amended "to expressly mandate that air carriers require drug and alcohol tests of all employees of its contractors—including employees of subcontractors at any tier—who perform safety-related functions such as aircraft maintenance." *Id.* at 163. In the initial stages of rulemaking, the FAA had performed a tentative RFA analysis that "counted among RFA small entities both air carriers and Part 145 repair stations." *Id.* at 175. However, after receiving comments, the FAA disagreed with

commenters who raised RFA issues with respect to contractors because the "contractors [we]re not among entities regulated under the testing regulations for the purpose of the RFA." *Id.* In taking this approach, the FAA claimed to be relying on *Mid-Tex Electric* and *Cement Kiln*. The court of appeals determined, however, that the factual situation was "materially different from th[ose] cases." *Id.* at 176. After reviewing the facts of both of these cases, the court stated:

> Unlike the parties claiming economic injury in the cited cases, contractors and subcontractors are directly affected and therefore regulated by the challenged regulations. It may be true that the regulations are immediately addressed to the employer air carriers which are in fact the parties certified to operate aircraft. *See* 14 C.F.R. pt. 121, app. I §§ I(B)-(C) (making "employer" responsible party for ensuring drug program is conducted properly), II (definition of "employer"); 14 C.F.R. pt. 121, app. J §§ I(B)-(C) ("employer" responsible for alcohol testing program), I(D) (definition of employer). Nonetheless, *the regulations expressly require that the employees of contractors and subcontractors be tested. See* 14 C.F.R. pt. 121, apps. I § III, J § II. Thus, the contractors and subcontractors (at whatever tier) are entities "'subject to the proposed regulation'—that is, those 'small entities to which the proposed rule will apply.'" *Cement Kiln*, 255 F.3d at 869 (quoting *Mid-Tex*, 773 F.2d at 342 (quoting 5 U.S.C. § 603(b))) (first emphasis in *Cement Kiln*; second emphasis in original). In other words, the 2006 Final Rule imposes responsibilities directly on the con-

tractors and subcontractors and they are therefore parties affected by and regulated by it. . . .

*Aeronautical Repair Station Ass'n*, 494 F.3d at 177 (emphasis added).

The rule that emerges from this line of cases is that small entities directly regulated by the proposed statute—whose conduct is circumscribed or mandated—may bring a challenge to the RFA analysis or certification of an agency. This rule coincides with the statutory language and congressional intent. However, when the regulation reaches small entities only indirectly, they do not have standing to bring an RFA challenge.

In this case, White Eagle maintains that its members are like the contractors in *Aeronautical Repair Station*:

> Th[e] underlying issue in this case is the question of what dairy producers are entitled to participate in the revenue pool of the Mideast Order. Milk producers are "subject to" milk order regulations no less the contractors in Aeronautical Repair Station were "subject to" drug testing regulations. The rule here is exactly like that in Aeronautical Repair Station; it directly affects dairy producers by governing the amount of their milk that must be delivered to a pool plant to receive the Order 33 blend price. . . .

Reply Br. 3. However, the amendment to the marketing order at issue, *i.e.*, the diversion limit, addresses only the amount of milk that a "handler" diverts to nonpool plants. *See* 70 Fed. Reg. at 56113 ("the *handler* diverted to nonpool plants not more than 50 percent in each of the months of August through February and 60 percent in each of the

months of March through July"). Thus, it is the handlers, not the producers, who are most akin to the contractor employees in *Aeronautical Repair Station,* because the regulation *"expressly"* addresses the handlers' actions. *See Lamers Dairy*, 379 F.3d at 469 ("Although it protects producers, the AMAA regulates handlers only."). Although the new diversion limit may affect the actions of producers, that is, they may sell to different handlers to ensure that their milk qualifies as producer milk for purposes of receiving the blend price, this is the same type of effect as the regulation in *Mid-Tex* had on wholesale customers and the regulation in *Cement Kiln* had on hazardous waste generators. In all of these situations, the proposed regulation may affect the behavior or decisions of the producers, the customers or the generators; however, the regulation does not directly address their activity. Consequently, because the amendment to the Mideast Milk Marketing Order concerning diversion limits *expressly* regulates only the conduct of handlers, only handlers have standing to challenge the RFA analysis performed by the agency. Because White Eagle instituted its RFA challenge in its capacity as a producer, as opposed to a handler, it does not have standing to maintain this challenge.

## C.

The plaintiffs also point to a number of alleged procedural infirmities in the rulemaking process. Among these are improper invocation of emergency rulemaking and improper delegation of rulemaking authority. We now address each of these contentions.

**1.**

White Eagle first maintains that the Government's issuance of a final decision on an emergency basis violated Section 557(b)(2) of the APA. We shall reverse an agency's determination that a rule ought to be made on an emergency basis only if that decision is arbitrary and capricious.[7]

The APA provides that an agency must issue a recommended decision before it issues a final decision unless it "finds on the record that due and timely execution of its functions imperatively and unavoidably so requires." 5 U.S.C. § 557(b)(2). The USDA Rules of Practice incorporate the statutory standard; they state in relevant part: "Omission of recommended decision. The procedure in this section may be omitted only if the Secretary finds

---

[7] The Government argues that the controversy related to the emergency rule is moot. It maintains that White Eagle seeks only declaratory relief, specifically a ruling that the agency violated the provisions of the APA and the AMAA in issuing the emergency rule. However, the emergency rule was followed by another comment period, after which time a final rule was promulgated. Because a plea for declaratory relief only can be granted if the controversy is ongoing and because a final order now has been issued, there is no relief which can be granted, and the claim is moot. The appellees further point out that White Eagle never claimed that the issue was "capable of repetition but evading review." Although it is true that White Eagle did not make the argument in its opening brief, it did maintain in its reply brief that the issue fell within this well-known exception to the mootness doctrine. We, therefore, shall proceed to the merits of the claim.

on the basis of the record that due and timely execution of his functions imperatively and unavoidably requires such omission." 7 C.F.R. § 900.12(d).

Presumably in response to the above requirement, the agency included the following statement accompanying the promulgation of the emergency rule:

> Evidence presented at the hearing and in post-hearing briefs establishes that current pooling standards of the Mideast order are inadequate and are eroding the blend price received by producers who are regularly and consistently serving the Class I needs of the Mideast marketing area and should be amended on an emergency basis. The unwarranted erosion of the blend price stems from inadequate supply plant standards and the lack of appropriate limits on diversions of milk. Additionally, the ability of a handler to pool the same milk on the Mideast Federal milk order and on a marketwide equalization pool administered by another government entity serves to potentially further erode the order's blend price.

> Consequently, it is determined that emergency marketing conditions exist and the issuance of a recommended decision is being omitted. The record clearly establishes a basis as noted above for amending the order on an interim basis and the opportunity to file written exceptions to the proposed amended order remains.

70 Fed. Reg. at 43341.

White Eagle contends that the USDA's statements do not satisfy the requirements of the statute or rule. It

takes issue with the agency's failure to identify, on the record, "specific facts and economic conditions that impose on the Department the critical and temporal pressures necessitating emergency action." Appellants' Br. 37.

The USDA's explanation for the promulgation of an interim, emergency order hardly can be characterized as a textbook example of compliance with the statute and regulations. These provisions certainly contemplate that the agency will provide a more specific and careful delineation of the reasons justifying such an exceptional course. Nevertheless, in the context of these proceedings, we cannot say that the lack of articulation justifies vitiating the administrative proceedings. First of all, it is apparent that, despite the USDA's lack of attention to detail, it did identify a problem that went to the heart of the AMAA: lack of diversion limits was resulting in an *ongoing* price erosion for producers. The USDA explained how the proposed amendments addressed the conditions and practices that presently were causing that problem. Furthermore, the USDA noted that the record supported amending the order on an interim basis. The USDA was correct in that estimation. Several producer witnesses asked the USDA to take immediate action to preserve the blend price. Thus, the USDA's statements, as supported by the record, are marginally sufficient, in the context of this administrative proceeding, to satisfy the requirement of a "find[ing] on the record that due and timely execution of its functions imperatively and unavoidably . . . require[d]" an emergency rule. *See* 5 U.S.C. § 557(b)(2).

Moreover, after the issuance of the interim emergency order, the parties were afforded additional opportunity for comment and, in fact, did take advantage of that opportunity. The parties therefore had the opportunity to express completely their views on the final order of the USDA that is before us today.

### 2.

White Eagle also submits that the manner in which the Secretary of Agriculture delegated his authority with respect to the amendment of the Mideast Marketing Order violated the APA and the USDA rules of practice. Specifically, it contends that "the exercise of combined subordinate and superior functions in a single subordinate" is "in excess of statutory authority." Appellant's Br. 35-36.

White Eagle makes clear that it is not arguing that an improper delegation of authority occurred. It concedes that, under the AMAA and its implementing regulations, the Secretary had the authority to issue and amend milk marketing orders, *see* 7 U.S.C. § 608c(1), (5), and that authority has been delegated properly from the Secretary to the Under Secretary of Agriculture for Marketing and Regulatory Programs, *see* 7 C.F.R. § 2.22(a)(1)(viii)(G), and again from the Under Secretary to the Administrator of the Agricultural Marketing Services, *see id.* § 2.79(a)(8)(viii).[8]

---

[8] White Eagle similarly acknowledges that the USDA's Rules of Practice allow for the Secretary to delegate his authority,

(continued...)

Instead, White Eagle maintains that it is implicit in the APA that, although a subordinate employee may be delegated responsibility for a recommended decision that is subject to further review, that same subordinate may not also have responsibility for issuing the final agency decision. In making this argument, White Eagle relies solely on 5 U.S.C. § 557(c), which states that "[b]efore a recommended, initial, or tentative decision, or a decision *on agency review of the decision of subordinate employees*, the parties are entitled" to submit proposed findings, exceptions to decisions and supporting reasons. 5 U.S.C. § 557(c) (emphasis added). This prefatory language, it maintains, mandates that when a "subordinate employee" has issued the interim decision, that same employee cannot be responsible for issuing the final decision.

We do not believe that such a reading can be gleaned from Section 557(c). First, Section 557(c) is a grant of a right to those participating in the rule making to comment at each stage of the process; the section is not dedicated to defining the authority of the Secretary or his subordinates. Second, the text of Section 557(c) belies the interpretation pressed by White Eagle. The entire prefatory clause on which White Eagle relies states: "Before a recommended, initial, or tentative decision, or a decision on agency review of the decision of subordinate employees, the parties are entitled to a reasonable opportunity

---

[8] (...continued)

including the authority to issue a final agency decision, to a subordinate.

to submit for *the consideration of the employees participating in the decisions . . . .*" 5 U.S.C. § 557(c) (emphasis added). This section, therefore, suggests that other individuals, apart from the agency head, may be involved in review of the decisions. We cannot conclude, therefore, that the issuance of the final decision here violated 5 U.S.C. § 557(c). The action was not in "excess of statutory authority."

## D.

White Eagle also raises two substantive issues with respect to the amendment to the Mideast Marketing Order. White Eagle first contends that the Government violated the AMAA because it considered the classification of milk as a condition for eligibility to receive the market blend price. Specifically, it submits that the USDA used the end use of milk as a consideration in determining which dairy farmers are eligible for a particular pool under the milk marketing order. Additionally, White Eagle maintains that the amendment to the Mideast Marketing Order failed to address adequately the facts as presented in the record. We evaluate both of these arguments below.

## 1.

White Eagle first submits that the USDA's consideration of the end use of milk in amending the Mideast Milk Marketing Order was in violation of the AMAA's mandate that prices "for milk purchased from producers . . . . shall

be uniform as to all handlers." 7 U.S.C. § 608c(5)(A). The AMAA requires that qualifying producers who deliver milk to handlers in the pool must be paid the "uniform prices for all milk so delivered *irrespective of the uses made of such milk* by the individual handler to whom it is delivered." 7 U.S.C. § 608c(5)(B)(ii) (emphasis added). White Eagle contends that the statutory scheme does not permit the agency to discriminate among producers in the pool on the basis of the end use to which a particular producer's milk actually is put. It submits that the USDA's action here attempts an end run around this rule by excluding, in the first instance, a producer from the pool on that very basis.

The Government contends, however, that the change in the pooling standards of the Mideast Milk Marketing Order was permissible. It submits that, in reaching its decision, the USDA focused on the integrity of the Mideast marketing region and its responsibility to the producers who service the needs of that region. The USDA identified and attempted to address a specific problem: Some producers were taking advantage of the higher Mideast blend price, but actually were diverting most of their milk to nonpool plants. As a result, milk supplies that were not reasonably associated with the region were entering the market and driving down the blend price for those producers regularly serving the needs of the market. In short, lax diversion standards were not distinguishing between a legitimate market surplus and the entry into the market of opportunistic producers.

We have held that non-pooled milk does not qualify as milk purchased from producers. *County Line Cheese Co. v.*

*Lyng*, 823 F.2d 1127, 1135 (7th Cir. 1987) (differentiating between "producers" and "dairy farmers not delivering milk as producers"); *see also* 7 U.S.C. § 608c(5)(B)(ii)(f). Thus, the question here is whether the USDA may define a "pool plant" (a plant required to pay the pool price) and "pooled milk" (the milk for which the pool price must be paid) with reference to the fluid milk needs of the region which it is regulating. *See County Line*, 823 F.2d at 1135 (stating that "nonpool milk is not subject to the minimum price requirement and the requirement of uniformity").

White Eagle's authorities support the idea that regional fluid milk needs may be considered in defining the "pool." In *Blair v. Freeman*, 370 F.2d 229, 237 (D.C. Cir. 1966), the court stated:

> The core of the Congressional program was a uniform minimum price for producers that did not turn on or vary with the nature of the use for which a producer was able to dispose of his milk. Hectic and unsettling competition among producers impelled Congress to formulate a device—uniform prices apportioned irrespective of individual utilization—*that would recognize the use factor in the equation developed to compute the marketwide pool*, but which would not distinguish between producers on the basis of the use made of their milk.

*Id.* at 237 (emphasis added). According to the court, Congress anticipated that the "use factor" would be employed in determining the pool of a particular market region; however, once the pool was defined, producers

would share in the proceeds of milk irrespective of how their particular milk was used. Similarly, in describing the regulatory scheme devised by Congress, the Court in *Zuber v. Allen*, 396 U.S. 168 (1969)—on which White Eagle also relies—stated:

> [T]he present system . . . provides for a uniform market price payable to all producers by all handlers. . . . The total volume of milk channeled into the market in each category is multiplied by the appropriate coefficient price and the two results are totaled and then divided by the total number of pounds sold. The result represents the average value of milk *sold in the marketing area* and is the basic "uniform" price. . . .

*Id.* at 177 (emphasis added). In other words, the marketing administrator must be able to assess the fluid milk needs of the region, and the producers serving those needs, in order to ensure an adequate milk supply to the market. Concomitantly, the marketing administrator must ensure that the producers who actually are supplying to a given market are receiving the benefits of the blend price. White Eagle has not pointed to any statutory or case-law authority which undermines this principle.[9] Indeed, if this Country's milk supply and prices are to be governed by regional milk marketing orders, as Congress intended, then the only way to ensure the orderly administration of that system is to allow the USDA to deter-

---

[9] White Eagle also relies on 7 U.S.C. § 608c(5)(B); however, that provision clearly addresses how proceeds are distributed to producers in the pool, not how the pool is defined.

mine which producers serve the needs of a given region and to grant those producers the benefit of the blend price set for that region. Consequently, we do not believe that the amendment to the Mideast Milk Marketing Order transgresses the substantive provisions of the AMAA.

**2.**

White Eagle also submits that, in reaching his decision, the Secretary did not consider information that historically has been considered in adjusting diversion limits. Because this failure suggests a change in policy, White Eagle continues, the Secretary ought to have explained his change of heart in greater detail. Specifically, the Secretary should have addressed directly White Eagle's evidence and offered a reason why that evidence, and the accompanying arguments, were rejected.

We cannot accept White Eagle's characterization of the Secretary's action with respect to this amendment to the Mideast Milk Marketing Order as a sea change in policy. The need for diversion limits "to safeguard against excessive milk supplies becoming associated with the market" had been a matter of discussion for several years. *See* 69 Fed. Reg. 19292, 19303 (Apr. 12, 2004) (adopting as final rule proposed changes on diversion limits first raised in 2001). Indeed, in instituting the prior diversion limits, the Secretary articulated the same concerns that justified the further amendment of those limits in the order at issue:

> The lack of a diversion limit standard applicable to pool plants opens the door for pooling much more

milk and, in theory, an infinite amount of milk on the market. While the potential size of the pool should be established by the order's pooling standards, the lack of diversion limits renders the potential size of the pool as undefined. With respect to the marketing conditions of the Mideast marketing area evidenced by the record, this decision finds that the lack of year-round diversion limits on producer milk has caused more milk to be pooled on the order than can reasonably be considered as properly associated with the market.

The lack of a diversion limit standard applicable for diversions to nonpool plants has also resulted in the pooling of milk that does not provide a service in meeting the Class I needs of the Mideast marketing area. Proposal 7 offers reasonable diversion limit standards that would be adjusted seasonally to reflect the changing supply and demand conditions of the Mideast marketing area. Therefore, a 60 percent diversion limit standard for each of the months of August through February and a 70 percent diversion limit standard for each of the months of March through July is adopted. To the extent that these diversion limit standards may warrant adjustments, the order already provides the Market Administrator with authority to adjust these diversion standards as marketing conditions may warrant.

*Id.* at 19303. It is not the case, therefore, that the setting of diversion limits to address the influx of milk that does not regularly serve a market's needs was a change in direction for the USDA.

We also cannot agree with White Eagle's characterization of the USDA's treatment of its arguments against decreasing the diversion limits. The USDA did not "simply dismiss[] all of Appellant's arguments as 'not persuasive.'" Appellants' Br. 32. The USDA recounted in detail White Eagle's objections to lowering diversion standards, including that the action would "decrease the volume of milk that manufacturing plants can pool, and will remove milk located in Wisconsin, Illinois, Minnesota and Iowa from pooling on the Mideast order." 71 Fed. Reg. at 3437. The USDA further noted that White Eagle's "witness was of the opinion that when the volume of milk pooled in manufacturing uses is decreased, producer milk that supplies manufacturing plants can face decreased returns." *Id.* It also noted White Eagle's argument that further adjudication of diversion standards was not necessary because the fluid milk needs of the Mideast market were being met.

In the discussion and findings associated with the rule, the Secretary again reiterated White Eagle's arguments and, indeed, found them "unpersuasive." However the Secretary went on to explain his statement:

> Providing for the diversion of milk to nonpool facilities is a desirable and needed feature of an order because it facilitates the orderly and efficient disposition of milk when not needed for fluid use. Despite the comments by White Eagle and NAJ, this decision maintains that it is necessary to safeguard against excessive milk supplies becoming associated with the market through the diversion process. Associating

more milk than is actually part of the legitimate reserve supply of the pooling handler unnecessarily reduces the potential blend price paid to dairy farmers who regularly and consistently service the market's Class I needs. Such milk should not be pooled. Without reasonable diversion limit provisions, the order's performance standards are weakened and give rise to disorderly marketing conditions. Accordingly, diversion limit standards for pool plants are permanently lowered by ten percentage points, from 60 percent to 50 percent for the months of August through February, and from 70 percent to 60 percent for the months of March through July.

*Id.* at 3440. In short, the USDA rejected White Eagle's arguments because they missed the mark. Although the diversion limits may have decreased the volume of milk available for manufacturing uses, with a resultant decrease in returns for some producers, preserving returns for every producer was not the USDA's primary goal. Instead, the problem that the USDA was attempting to address through diversion limits was the opportunistic entry into the market by producers (to take advantage of the higher blend price) who did not regularly serve the Class I needs of the market, with the resultant additional costs. Thus, far from being a reason not to implement the diversion limits, the fact that some producers would be excluded from the pool (because they did not serve regularly the fluid needs of that market), and may suffer a decrease in returns (because they could no longer benefit from the higher blend price), was con-

sistent with the policy approach the USDA had adopted in its prior milk marketing orders and continued in the order at issue.

We cannot say, therefore, that the USDA's adoption of the present order was arbitrary or capricious, nor do we believe that the USDA failed to consider relevant evidence in adopting the current rule.

### Conclusion

For the foregoing reasons we affirm the judgment of the district court.

AFFIRMED